Sanjay Wadhwa
Lara S. Mehraban
Alexander M. Vasilescu
Neal Jacobson
Ranah L. Esmaili
Lee A. Greenwood
**Attorneys for the Plaintiff**
**SECURITIES AND EXCHANGE COMMISSION**
New York Regional Office
Brookfield Place
200 Vesey Street, Suite 400
New York, New York 10281-1022
(212) 336-0178 (Vasilescu)

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

---

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | Civil Case No. |
| Plaintiff, | |
| v. | Complaint |
| CHRISTOPHER FREEMAN BROGDON, | Jury Trial Demanded |
| Defendant, | |
| -and- | |
| CONNIE BROGDON, TYGH BROGDON, BROGDON FAMILY LLC, GORDON JENSEN HEALTHCARE ASSOCIATION, INC., JRT GROUP PROPERTIES, LLC, MOBAMA NURSING, LLC, NATIONAL ASSISTANCE BUREAU, INC., SAINT SIMONS HEALTHCARE, LLC, and WINTER HAVEN HOMES, INC., | |
| Relief Defendants. | |

---

Plaintiff Securities and Exchange Commission (the "Commission"), for its Complaint

against Defendant Christopher Freeman Brogdon, and Relief Defendants Connie Brogdon, Tygh

Brogdon, Brogdon Family LLC, Gordon Jensen Healthcare Association, Inc., JRT Group

Properties, LLC, Mobama Nursing, LLC, National Assistance Bureau, Inc., Saint Simons

Healthcare, LLC , and Winter Haven Homes, Inc. (the "Relief Defendants"), alleges as follows:

## SUMMARY

1.     The Commission brings this emergency action to halt ongoing fraudulent conduct

by Christopher Brogdon ("Brogdon" or "Defendant") in connection with his business of

purchasing, constructing, renovating, leasing, managing and selling nursing homes, assisted

living facilities, and retirement housing (together, the "Facilities").  Since 1992, Brogdon has

raised over $190 million for these projects through 54 conduit municipal bond and private

placement offerings (the "Brogdon Offerings").  Brogdon has conducted his fraud, as described

below, through at least 43 entities he owns or controls (together, the "Brogdon Entities").[1]

2.     Brogdon stated in the offering documents for the Brogdon Offerings provided to

investors that the money raised would be used for the purpose of purchasing, constructing or

renovating a particular Facility, and that payments of interest and principal would come

primarily from the revenues generated by the operation of that Facility.  Brogdon also stated that

a significant amount of the money raised would be used for working capital, which would ensure

that the Facility could remain operational during the transition of ownership.

3.     For the 40 conduit municipal bond offerings, Brogdon further stated that the

trustee bank would set aside an additional portion of the investment proceeds in a debt service

---

[1] The Brogdon Entities are:  Arcadia Partners, LLC; Attalla Nursing ADK, LLC; Bama Oaks Retirement, LLC;
Bleckley NH LLC; Cedala, LLC; Chattahoochee Nursing, LLC; Chelsea Investments, LLC; Chestnut Independent
Living, LLC; Chulio Assisted Living, LLC; Coosa Nursing ADK, LLC; Country Club Road ALF, LLC; Eaglewood
Property Holdings, LLC; Edwards Redeemer Property Holdings, LLC; Golden Monroe, LLC; Goodwill Healthcare
& Rehab, LLC; Gordon Jensen Healthcare Association, Inc.; Green Street LLC; Greene County Health Care, LLC;
Harrah Whites Meadows Nursing, LLC; High Street Nursing, LLC; Highlands Assisted Living, LLC; MCL
Nursing, LLC; Meeker North Dawson Nursing, LLC; Knollwood NH LLC; Limestone Assisted Living, LLC; LV
Medical Properties III, LLC; Mobama Nursing, LLC; Morris Landing, LLC; National Assistance Bureau, Inc.; Oak
Partners Two, LLC; Oklahoma Operating LLC; PHNH LLC; Polo Road Assisted Living, LLC; Ridgeview Assisted
Living, LLC; Riverchase Village ADK, LLC; Saint Simons Healthcare, LLC; Senior Care, Inc.; Southeastern
Cottages, Inc.; Southern Tulsa, LLC; Veranda ALF, LLC; Water Oaks Partners, LLC; Waters of Scottsburg II, LLC;
and Winter Haven Homes, Inc.  The Brogdon Entities are entities that serve as the borrowers, issuers or guarantors
of the Brogdon Offerings or that operate or manage the Facilities.

reserve fund ("DSRF"), to be used only if needed to satisfy debt service obligations, and to be replenished if drawn down. Brogdon also stated that he had never failed to comply with his agreements in prior offerings to provide investors with required financial statements or notice of material events, such as draws on the DSRFs or the sale of bond collateral.

4.     These statements were false. Instead of using investor proceeds from a particular Brogdon Offering for the Facility or project that was the subject of the offering, Brogdon secretly diverted a portion of the proceeds to either pay for his and his wife's lavish lifestyles or to prop up his entire business enterprise, which included other Facilities, restaurants, and commercial real estate holdings. He did this, in part, by instructing his bookkeepers to commingle, in a handful of master accounts he controlled, the working capital for the Facility or project that was the subject of the offering with the funds from his various other businesses. He then used the commingled funds to pay whatever expenses were due.

5.     Brogdon also misappropriated the revenues received from the Facilities. Instead of using those revenues to make required payments to investors as he had represented in the offering documents, Brogdon commingled these revenues with other funds and used them for other purposes, including to pay investors in unrelated Brogdon Offerings, to pay unrelated business expenses and to pay himself and his wife.

6.     Brogdon consistently failed to file required financial statements and drew down on the DSRFs in order to make interest payments to investors, without disclosure and without replenishing the DSRFs as required by the conduit municipal bond offering documents.

7.     As a result, when payments of interest or principal came due on the Brogdon Offerings, often neither Facility revenues nor DSRFs were available to make those payments.

Brogdon often relied on third parties to make loans to his companies in order to cover these payments to investors.

8. Brogdon began commingling funds in this manner at least as early as 2000. Yet he continued to raise tens of millions of dollars through conduit municipal bond and private placement offerings without disclosing the true nature of the investments.

9. Brogdon made concerted efforts to conceal the fact that payments of interest and principal were not being made from Facility revenues because, upon information and belief, doing so would have impaired his ability to raise the new money necessary to keep his scheme afloat. Brogdon further concealed the financial performance of the Facilities underlying his conduit municipal bond offerings by failing to file required financial statements.

10. Emergency relief is needed because Brogdon's fraudulent conduct is ongoing. Many of the Facilities have negative cash flow and cannot cover the required payments to investors. Brogdon has been making payments to investors by borrowing money from third parties, drawing down on personal lines of credit (both of which are improper sources under the offering disclosures) and attempting to sell the Facilities that serve as the security and source of debt service payments for the Brogdon Offerings. Without emergency relief, there is a very real possibility that Facilities will fail and that proceeds of the piecemeal sales of Facilities will be dissipated. The emergency relief requested in this action will ensure that the Brogdon Entities are preserved and their value maximized in order to return as much money as possible to investors.

11. In response to two lawsuits filed by the trustee bank for two separate offerings (one of which was an action for a receivership), Relief Defendant National Assistance Bureau, Inc. filed for Chapter 11 bankruptcy in the Northern District of Georgia on October 13, 2015.

4

The emergency relief in this action will ensure that all of the Facilities will be administered by an independent fiduciary for the benefit of investors under the jurisdiction of one court.

## VIOLATIONS

12.      By virtue of the conduct alleged herein, Defendant, directly or indirectly, singly or in concert, has engaged and is engaging in transactions, acts, practices and courses of business that constitute violations of Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)], and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5]; and Defendant, directly or indirectly, has aided and abetted, or has control person liability pursuant to Section 15(b) of the Securities Act [15 U.S.C. § 77o(b)], and Sections 20(a) and 20(e) of the Exchange Act [15 U.S.C. §§ 78t(a), (e)] for, the Brogdon Entities' violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)] and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

13.      Unless the Defendant is permanently restrained and enjoined, Defendant will again engage in the acts, practices, transactions and courses of business set forth in this complaint and in acts, practices, transactions and courses of business of similar type and object.

## NATURE OF THE PROCEEDSINGS AND RELIEF SOUGHT

14.      The Commission brings this action pursuant to Sections 20(b), (d) and (e) of the Securities Act [15 U.S.C. §§ 77t(b), (d) & (e)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)] to enjoin such transactions, acts, practices, and courses of business, and to obtain disgorgement, prejudgment interest, civil money penalties, an officer and director bar, and such other and further relief as the Court may deem just and appropriate.

15.     The Commission seeks a temporary restraining order and preliminary injunction against Defendant and the Relief Defendants enjoining Defendant from future violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5], freezing the assets of Defendant and Relief Defendant Connie Brogdon, including their bank and brokerage accounts, requiring Brogdon to provide a verified accounting, prohibiting Defendant and Relief Defendants from destroying or altering any documents, appointing a receiver, permitting the Commission to conduct expedited discovery, and prohibiting the filing of any bankruptcy, foreclosure, receivership actions by or against any of the entities subject to the receivership.

## JURISDICTION AND VENUE

16.     This Court has jurisdiction over this action pursuant to Sections 20(b) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b) and 77v(a)] and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

17.     Venue in this District is proper pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa] because acts and transactions constituting violations alleged in this Compliant, including the offer and sale of securities, occurred within the District of New Jersey.

18.     In connection with the conduct alleged in this Complaint, the Defendant, directly or indirectly, has made use of the means or instrumentalities of transportation or communication in, and the means or instrumentalities of, interstate commerce.

## DEFENDANT

19.     **Brogdon**, age 66, is a resident of Atlanta, Georgia.  He has been in the nursing home, assisted living, and retirement community business for more than 25 years; he also has

6

other real estate and restaurant business ventures throughout Georgia and other nearby states. Brogdon has served as the Chairman of the Board of companies such as Retirement Care Associates (1991-1998), Contour Medical (1994-1998), and NewCare Health Corporation (1998-1999).  From September 2009 to October 13, 2015, Brogdon served as Vice-Chairman and Chief Acquisitions Officer of AdCare Health Systems, Inc. ("ADK"), a publicly-held, SEC-reporting company with its common stock listed on the NYSE under the ticker symbol ADK.[2]  Brogdon is currently CEO, President, and Director of Global Healthcare REIT, Inc. ("Global"), another publicly-held, SEC-reporting company in the business of acquiring real estate properties in the healthcare industry, with its common stock quoted on OTC Link operated by OTC Markets Group, Inc. under the ticker symbol GBCS.  In 1986, Brogdon was censured, fined, and barred from association in any capacity by the NASD because, as principal and owner of member firm Harbor Town Securities Corporation, he was found to have effected transactions in securities while failing to maintain adequate net capital, and, while in net capital deficiency, he was found to have withdrawn cash and securities investments from the firm's accounts.  Prior to 1986, Brogdon held Series 1, 24, and 53 licenses.

**RELIEF DEFENDANTS**

20.     **Connie Brogdon**, age, 57, is a resident of Atlanta, Georgia.  She is Brogdon's spouse.  She has or had a majority equity interest in many of the entities that Brogdon uses to own, operate, or lease nursing home and assisted living Facilities, though it is Brogdon who performs or directs the work associated with these projects.  The primary personal bank account that has received proceeds of the alleged fraud is in her name; that account also receives salary and other compensation payments for Brogdon.  She received proceeds from at least four

---

[2] Brogdon resigned from ADK on October 13, 2015, which resignation is effective "as of" the company's annual meeting, which is scheduled to be held on December 10, 2015.

Brogdon Offerings to which she was not entitled.  She has never held any securities licenses or registrations.

21.    **Tygh Brogdon**, age 44, is a resident of Saint Simons Island, Georgia.  He is one of Brogdon's four children.  From 1998 through 2008, Tygh Brogdon was President of Brentwood Healthcare LLC, an entity that managed nursing home and assisted living Facilities, including at least six Facilities that were the subject of Brogdon Offerings.  Since at least 2008, Tygh Brogdon has received monthly distributions of a portion of the lease payments from nursing homes and assisted living Facilities owned by either Brogdon or the Brogdon Entities through JRT Group Properties, LLC.  He received proceeds from at least one Brogdon Offering to which he was not entitled through JRT Group Properties, LLC.  He has never held any securities licenses or registrations.

22.    **Brogdon Family LLC ("BFLLC")** is a Georgia limited liability company formed in 1998, with its principal place of business at 3050 Peachtree Road NW, Suite 355, Atlanta, Georgia.  BFLLC owns nursing home and assisted living Facilities in the Southeastern and Midwestern United States, a management company for certain of the Facilities, retail space in Roswell, Georgia, and restaurants primarily in the Atlanta metro area.  Brogdon is a Member and the Registered Agent of BFLLC.  BFLLC was a guarantor for payments of principal and interest for certain of the Brogdon Offerings.  Certain of the documents provided to investors describe Brogdon as "controlling" BFLLC.  Brogdon and his wife, Connie Brogdon, each own 5% of BFLLC, with the remaining interests purportedly divided among Brogdon's four children (20% each) and grandchildren (10%, owned by a trust).  Brogdon and his wife each reported 50% of the profits and losses for BFLLC on their 2014 tax returns.  BFLLC has received proceeds from at least 11 Brogdon Offerings to which it was not entitled.

8

23.     **Gordon Jensen Healthcare Association, Inc. ("Gordon Jensen")** is a Michigan 501(c)(3) corporation formed in 1974 under the name "Gordon Jensen Evangelistic Association." Upon information and belief, Gordon Jensen's principal place of business is 595 Atlanta Street, Suite D, Roswell, Georgia.  Gordon Jensen served as the borrower for at least five of the Brogdon Offerings.  Brogdon has exercised control over Gordon Jensen's bank accounts, operations, and the revenues generated by its Facilities.  Brogdon also directed that debt service payments be made from its bank accounts and other bank accounts Brogdon controlled for the Brogdon Offerings for which Gordon Jensen served as borrower.  Brogdon used commingled funds in lieu of and in addition to revenues generated by the Gordon Jensen Facilities to help Gordon Jensen satisfy its debt service obligations to investors.

24.     **JRT Group Properties, LLC ("JRT Group")** is a Georgia limited liability company formed in 2004, with its principal place of business in Saint Simons Island, Georgia. JRT Group is owned by Tygh Brogdon and two other individuals.  JRT Group receives monthly distributions of lease payments and other revenue generated by nursing home and assisted living Facilities owned, in whole or in part, by Brogdon, BFLLC, or JRT Group.  JRT Group has received proceeds from at least one Brogdon Offering to which it was not entitled.

25.     **Mobama Nursing, LLC ("Mobama")** is a Georgia limited liability company formed in 2007, with its principal place of business in Saint Simons Island, Georgia.  Mobama owns or has owned nursing home and assisted living properties.  Brogdon has exercised control over Mobama's bank accounts, operations, and the revenues generated by its Facilities.  At Brogdon's direction, Mobama sold one of its Facilities to Gordon Jensen using proceeds of a Brogdon Offering in a transaction that was not arms-length.

26.      **National Assistance Bureau, Inc. ("NAB")** is a Georgia corporation formed in 1989 with its principal place of business at 595 Atlanta Street, Suite D, Roswell, Georgia.  NAB served as the borrower for at least 18 of the Brogdon Offerings.  Brogdon has exercised control over NAB's bank accounts, operations, and the revenues generated by its Facilities.  Brogdon also directed that debt service payments be made from its bank accounts and other bank accounts he controlled for the Brogdon Offerings for which it served as borrower.  Brogdon used commingled funds in lieu of and in addition to revenues generated by NAB Facilities to help NAB satisfy its debt service obligations to investors.  NAB filed for Chapter 11 bankruptcy in the Northern District of Georgia on October 13, 2015.

27.      **Saint Simons Healthcare, LLC ("Saint Simons")** is a Georgia limited liability company formed in 2001, with its principal place of business at 595 Atlanta Street, Suite D, Roswell, Georgia.  Saint Simons is a management company that operates nursing home and assisted living Facilities for Brogdon.  Currently, Saint Simons and its affiliates operate approximately 24 Facilities in Georgia and up to four other states.  Though Saint Simons is wholly owned by BFLLC, Brogdon is listed as the Registered Agent and is described as the owner and manager of Saint Simons in offering documents provided to investors. Saint Simons has received proceeds from at least six Brogdon Offerings to which it was not entitled.

28.      **Winter Haven Homes, Inc. ("Winter Haven")** is a Georgia corporation formed in 1987, with its principal place of business at 3050 Peachtree Road NW, Suite 355, Atlanta, Georgia.  Winter Haven has developed, owned, and operated nursing homes and assisted living Facilities throughout the Southeastern and Midwestern United States.  Today, Winter Haven focuses on owning and leasing its Facilities to third parties.  Brogdon co-founded Winter Haven and is listed as its Registered Agent.  As of December 31, 2014, Connie Brogdon owned 100%

10

of Winter Haven.  Winter Haven has received proceeds from at least four Brogdon Offerings to which it was not entitled.

## FACTS

29.     Brogdon has been in the business of purchasing, constructing, renovating, leasing, managing and selling nursing homes, assisted living facilities, and retirement housing throughout the Southeastern and Midwestern United States for over 25 years.  Brogdon has financed these projects through the issuance of securities—conduit municipal bond offerings, certificates of participation in prior bond offerings, and private placements—as well as bank loans.

30.     From 1992 to 2014, Brogdon acquired or renovated at least 60 Facilities through 54 separate offerings that raised at least $189,980,000.  At least 22 of these offerings, with a remaining principal amount of over $99,000,000, remain outstanding.  Three of the outstanding municipal bond offerings are in default, with past due interest owing in the amount of over $870,000.

31.     At times, Brogdon raised money from multiple sources for the same Facility, either concurrently or within months of each other.  For each offering, Brogdon either established or used a corporation or limited liability company to serve as the borrower.

32.     Brogdon then established or directed to be established a bank account in the name of that entity to receive revenue or lease payments from the Facility connected to that offering.

33.     The staff has identified over 130 entities and over 225 business bank accounts in connection with the Brogdon Offerings, Facilities, or management companies.

**The Brogdon Bond Offerings**

34.     Brogdon raised at least $168,360,000 through the issuance of public conduit municipal revenue bonds, or certificates of participation in such bonds (the "Brogdon Bond Offerings").

35.     Revenue bonds are bonds backed by revenues from a specific project or source (here, revenues from the Facilities that are being purchased or renovated with the proceeds of the bond issuance).  Municipal authorities serve as the issuers in municipal bond offerings but issue the securities on behalf of a "conduit" borrower, such as a non-profit college, hospital, or nursing home.  The conduit borrower typically agrees to make payments of interest and principal solely from the revenue from the underlying Facility.

36.     In the typical Brogdon Bond Offering, the proceeds from the sale of the bonds were used to undertake a particular project such as the acquisition or renovation of a Facility for the benefit of the borrower, and the borrower was required to make the debt service payments to investors.  The borrower pledged the Facility and its revenues as security for the bonds.  Some of the Brogdon Bond Offerings were structured so that the municipal authority issuer leased the Facility to the borrower; thus, the borrower was the "lessee" in those issuances.  In some instances the lessee would then sublease the Facility and generate revenues through lease payments received from the sub-lessee.  Brogdon controls, and has at all relevant times controlled, the entities that serve or served as borrowers for the Brogdon Bond Offerings.

37.     The Official Statement is a type of disclosure document used in municipal bond offerings.  Official Statements are posted on the Municipal Securities Rulemaking Board's Electronic Municipal Market Access ("EMMA") website, and are provided to investors in the offering.

38.     The Official Statements for the Brogdon Bond Offerings, many of which were signed by Brogdon, contain four key sets of disclosures.

39.     First, the Official Statements for the Brogdon Bond Offerings contain a "Plan of Financing" that identifies the estimated sources and uses of the proceeds raised in the offering.  It was Brogdon's practice to provide this information for each of the Brogdon Bond Offerings.  In addition to the costs of purchasing or renovating the particular Facility, and the related DSRF, the Plans of Financing for the Brogdon Bond Offerings also typically included money for "working capital."  Working capital is cash that the borrower may use to cover day-to-day operating expenses and maintenance associated with the Facility.  For the Brogdon Bond Offerings, the bond proceeds allocated to working capital funds were sent to a Brogdon-controlled bank account.

40.     Second, the Official Statements identify the source of the funds to be used to make debt service payments to investors, on either a semi-annual or monthly basis.  The primary source of these payments was the revenue generated by the Facility being acquired or serving as collateral for the bonds.  Other available sources of payments included payments from entities or individuals that guaranteed repayment, and the various funds established at the trustee bank (such as the DSRF).  None of the Official Statements disclosed that bondholder payments could be made by persons, entities or Facilities with no connection to the offering.

41.     Third, the Official Statements summarize or attach the trust indenture that was entered into between the issuer and trustee bank.  The trust indentures require the trustee bank to establish various funds related to the offering, including the DSRF.  According to the trust indentures for the Brogdon Bond Offerings, the DSRF could be drawn down by the borrower if

the disclosed sources of payments were insufficient but, in such event, it had to be replenished within twelve months and (typically) with twelve equal monthly payments.

42.      Finally, each Official Statement contains a statement that the borrower has not failed to comply with any prior continuing disclosure "Undertaking" pursuant to Exchange Act Rule 15c2-12 [17 C.F.R. § 240.15c2-12].  "Undertaking" is defined as the borrower's agreement to file, on EMMA or its predecessor,[3] annual financial information and operating data or notice of certain material events including draws on DSRFs and "any material release, substitution, or sale of property securing repayment" of the bonds.

**The Brogdon Private Placement Offerings**

43.      Brogdon raised at least $22,435,000 through private placement offerings (the "Brogdon Private Placement Offerings").

44.      The Brogdon Private Placement Offerings were typically mixed equity and debt offerings, and were described as certificates of participation or membership interests in a limited liability company formed by the placement agent (the "Lender LLC").  The Lender LLC used the funds it raised from investors to purchase a promissory note from the Brogdon Entity that purchased the Facility (the "Borrower LLC").  Brogdon controlled the Borrower LLCs.

45.      In exchange for its investment, the Lender LLC received a membership interest in the Borrower LLC.  Investors in the Lender LLC received an equity stake in the Borrower LLC, periodic 10% interest payments, return of principal on the maturity date, and a portion of any capital gains generated by the sale of the Facility to a third party.

---

[3] For periods prior to July 1, 2009, municipal issuers made continuing disclosure filings within a decentralized system of private electronic repositories called the Nationally Recognized Municipal Securities Information Repository ("NRMSIR") system.  In December 2008, Exchange Act Rule 15c2-12 [17 C.F.R. § 240.15c2-12] was amended to designate the MSRB's EMMA system as the central repository for continuing disclosures by municipal issuers and obligated persons.

46.     The Confidential Disclosure Memorandum ("CDM") is the disclosure document provided to investors in the Brogdon Private Placement Offerings.

47.     While payments of principal and interest on the certificates of participation or membership interests were unsecured, and the Facilities were often encumbered by a senior mortgage, for some offerings Brogdon, his wife, BFLLC, or another Brogdon Entity guaranteed the repayment of interest and principal.

48.     The CDMs, most of which were signed by Brogdon, contain a Plan of Financing that describes the estimated sources and uses of the proceeds of the offering, including the purchase price of the Facility, expected renovation costs, and working capital.  Brogdon provided the information contained in the Plans of Financing in the CDMs.

49.     The CDMs also state that the exclusive sources of payments of interest and principal to investors are: (1) the revenues generated by the ownership, lease, or operation of the Facility, or (2) payments by the guarantors, if any.  The CDMs do not disclose that payments may come from other entities, persons, or Facilities that had no involvement in the offering.

**Brogdon's Control Over the Borrowers**

50.     Brogdon controlled the borrower entities in the Brogdon Offerings at all relevant times, and continues to control them.

51.     Some borrowers were Georgia limited liability companies or corporations that were formed for the purpose of purchasing the Facility.  Brogdon served as manager and controlled them, while a third party (often Connie Brogdon) purported to hold the majority ownership interest in those entities.

52.     The other borrowers in the Brogdon Offerings were NAB, Gordon Jensen and Senior Care, Inc.  Brogdon controlled those borrowers as well, although he did not have any disclosed role in those entities.

53.     Brogdon and his companies received the revenues generated by the Facilities owned or leased by the borrower entities in the Brogdon Offerings, as well as the working capital distributed in the offerings for which those entities served as the borrower.  Brogdon directed his bookkeepers to make debt service payments to investors for all of those borrowers' offerings. Brogdon also provided the information in the Official Statements and CDMs concerning the use of the offering proceeds on behalf of those entities.

**Brogdon Commingled Offering Proceeds and Facility Revenues**

54.     Beginning as early as 2000, Brogdon directed the commingling of funds generated by unrelated Facilities, securities offerings, and other business ventures.  Brogdon then used those commingled funds to make required payments to investors and for his personal and other business use.

55.     Brogdon implemented this commingling through instructions to his staff who handled the bookkeeping for the Facilities' accounts, and made debt service payments to investors from those accounts.

56.     For instance, when working capital was received from the proceeds of a Brogdon Offering, Brogdon instructed his staff to transfer that money to whichever Brogdon business accounts needed to pay expenses, regardless of their connection to a Facility.  Likewise, when Facility revenues were received into an account designated for that Facility, Brogdon directed his staff to transfer those funds to whichever other entity had expenses due, including the master accounts of Winter Haven and BFLLC.

16

57.     As a result of this practice, and because certain Facilities were generating insufficient revenue to cover their expenses, when debt service payments came due on an offering associated with a Facility, there were often insufficient funds in that Facility's account to cover the payment.  Thus, debt service would be paid by transferring funds from whatever Brogdon related account had available funds, regardless of whether that account had any relationship to the Facility or to the relevant Brogdon Offering.

58.     In addition to Facility revenues, the commingled funds came from other sources such as rent received on Brogdon's commercial real estate, restaurants, and purported loans from third parties.

59.     In addition to debt service payments, Brogdon directed his bookkeepers to pay other expenses from the commingled funds, including: (i) finance payments, maintenance and hanger costs, and pilot salaries for two airplanes Brogdon used for both business and personal travel; (ii) payments to at least one of Brogdon's restaurants; (iii) large American Express credit card bills for Winter Haven, Saint Simons and their employees of more than $20,000 per month, which include both business expenses (often unrelated to the Facilities connected to offerings) and personal expenses; (iv) payments on multiple cars purchased for Brogdon's bookkeeper; and (v) payments due on unrelated commercial and bank loans, as well as loans to Winter Haven, Saint Simons, and BFLLC by other third parties.

60.     Brogdon's  practice of commingling funds escalated over time as Brogdon purchased more Facilities and conducted more securities offerings, which required more transfers to cover related expenses such as debt service, and because certain Facilities were generating insufficient revenue to cover debt service payments.

**Brogdon Misrepresented the Nature of the Investment**

61.     Brogdon, directly or indirectly, misrepresented the nature of investors' and bondholders' investments in the Brogdon Offerings.

62.     Brogdon represented in the offering documents that investors and bondholders would be investing in a particular Facility, and that they would be paid interest and principal primarily with the revenues from the operation of those Facilities.

63.     Contrary to those disclosures, Brogdon used part of the proceeds of their investments and the revenues generated by the Facilities for Brogdon's other business ventures, including unrelated Facilities that were not generating sufficient revenues to cover their expenses, at least one Brogdon restaurant, and his commercial real estate holdings.

64.     Brogdon misrepresented the true nature of the investment.  Instead of investing in a single offering or Facility, investors and bondholders were actually, unknowingly investing in Brogdon and his many business ventures.

**Brogdon Misappropriated Offering Proceeds**

65.     Brogdon, directly or indirectly, misappropriated funds raised for specific projects or working capital in the Brogdon Offerings.  The following are examples:

The Arcadia Project

66.     In the spring of 2013, Brogdon raised money for a retirement housing development project in Conyers, Georgia (the "Arcadia Project") through two offerings: (i) Certificates of Participation in Development Authority of Clayton County, Georgia Revenue Bonds and Savannah Economic Development Authority Subordinated Mortgage Healthcare Facility Revenue Bonds (the "Clayton V Bond Offering"); and (b) Cherokee Financial LLC

18

Certificates of Participation in a 10% Promissory Note Issued by Arcadia Partners, LLC (the "Cherokee Financial Private Placement").

67.     The CDM for the Cherokee Financial Private Placement stated that $1.4 million of the proceeds was to be used for the construction of the Arcadia Project, and that the private placement investors were to be paid interest and principal from the revenues realized from the ownership and operation of the Arcadia Project.

68.     Brogdon provided the information concerning the use of proceeds in the CDM for the Cherokee Financial Private Placement, and reviewed the CDM as manager of Arcadia Partners.

69.     Contrary to those disclosures, $177,936 of the proceeds designated for use in the Arcadia Project was used to make quarterly interest payments back to the investors in the Cherokee Financial Private Placement, and $644,157.50 of the proceeds was used for undisclosed expenses and payments, including payment to one of Brogdon's restaurants, payment of Winter Haven's American Express bill, payment of taxes on two unrelated Brogdon-owned nursing homes in Oklahoma, and a transfer to Connie Brogdon's personal account in the amount of $50,000.

### Clayton IV Bond Offering

70.     Through September 12, 2011, Brogdon raised $2,150,000 through Certificates of Participation in Development Authority of Clayton County, Georgia First Mortgage Revenue Bonds (the "Clayton IV Bond Offering").

71.     Contrary to the disclosures in the Official Statement for the Clayton IV Bond Offering, which stated that $425,000 of the proceeds was to be used as working capital for the Facility that served as the security and source of payment of debt service on the bonds, Brogdon

used the working capital to pay loans on an unrelated nursing home and commercial property owned by BFLLC, to make lease payments on Winter Haven's office space and his airplane, to pay Winter Haven's American Express bill, to pay the salary of one of his employees, to make a payment to a Brogdon restaurant, and to make a transfer to Connie Brogdon's personal account in the amount of $74,000.

<u>Chestnut Financial Private Placement</u>

72.     On or about February 28, 2011, Brogdon raised $1,950,000 through Certificates of Participation in 10% Promissory Note Issued by Chestnut Independent Living, LLC and 10% Promissory Note Issued by Highlands Assisted Living, LLC (the "Chestnut Financial Private Placement") in order to acquire and pay renovation costs on two Facilities.

73.     The CDM disclosed that $900,000 of the proceeds were to be used for working capital for the two Facilities.  These funds were not used as disclosed.  Instead, $500,180.84 was used to make debt service payments on two unrelated Brogdon Bond Offerings (which also ran afoul of the source of payment disclosure in those bond offering disclosure documents), to pay expenses for unrelated Brogdon Facilities, and to make transfers to Connie Brogdon's personal account in the amount of $170,000.

74.     Since December 2008, Brogdon and the Brogdon Entities have received more than $4.4 million in working capital funds from the Brogdon Offerings.  For at least 17 of the Brogdon Offerings, proceeds allocated to working capital funds were sent to a Brogdon-controlled bank account after the offering closed.

**Brogdon Misrepresented the Source of Payments of Interest and Principal**

75.     As a result of the commingling and misuse of funds, Brogdon often had insufficient funds to pay debt service to investors in the Brogdon Offerings.  To come up with

the necessary payments, Brogdon directly or indirectly systematically raided the DSRFs for the Brogdon Bond Offerings and used undisclosed loans from third parties.

76.     Brogdon has drawn down the DSRF for twelve of the sixteen outstanding Brogdon Bond Offerings, for a total DSRF deficiency of more than $3,140,000.

77.     For seven of these offerings, Brogdon began drawing down the DSRFs in the first year after the closing, and failed to replenish the DRSFs as required.

78.     Brogdon was not entitled to raid these DSRFs without giving bondholders notice (through the filing of material event notices on EMMA) and without replenishing the reserves in the manner required by the trust indenture and disclosed to investors.

79.     As reflected on EMMA, Brogdon has never caused a material event notice to be filed disclosing his draws on the DSRFs and has not replenished the DSRFs as required.

80.     Brogdon also made debt service payments from third party loans or advances. For instance, the owner of one of the broker-dealer firms that served as a placement agent for certain of the Brogdon Private Placement Offerings fronted interest payments for Brogdon on 23 separate occasions for four different Brogdon Private Placement Offerings beginning in May 2010.

81.     Brogdon knew that investors were being paid in this manner, that the timeliness of payments was material to investors, and that the sources of these payments were inconsistent with the disclosures in the CDMs.

82.     After the first fronted interest payment from this broker-dealer owner, Brogdon raised an additional $11,875,000 in seven subsequent Brogdon Private Placement Offerings through the same placement agent.

83.     Brogdon failed to disclose the fronted interest payments to investors in these subsequent Brogdon Private Placement Offerings because, upon information and belief, such disclosure would have impeded his ability to raise money from the broker-dealer firm's customers in subsequent private placement offerings.

**Brogdon Misrepresented the Arms-Length Nature of Certain Transactions**

84.     In September 2013, Brogdon raised $8,610,000 in the Medical Clinic Board of the City of Mobile (Second) First Mortgage Revenue Bonds (the "Mobile III Bond Offering") for the purpose of purchasing and renovating Gordon Oaks Nursing Home in Mobile, Alabama (the "Gordon Oaks Facility").

85.     The Official Statement falsely stated that the purchase of the Gordon Oaks Facility was an arms-length transaction.  Though the borrower in the Mobile III Bond Offering was Gordon Jensen, Brogdon controlled Gordon Jensen at the time of the offering.

86.     The Plan of Financing in the Official Statement disclosed that, among other uses, $6,900,000 of the proceeds was to be used by Gordon Jensen to purchase the Gordon Oaks Facility and $300,000 was to be used as working capital for the Gordon Oaks Facility.

87.     The Official Statement also stated that Gordon Oaks "will be acquired from Mobama Nursing, LLC, an unaffiliated entity."

88.     That statement was false, as Brogdon controlled both Gordon Jensen, the buyer, and Mobama, the seller.  Brogdon signed the closing statement for the transaction on behalf of Mobama, and directed the use of the proceeds due to the seller.  More than $6.5 million was used to retire indebtedness owed by Mobama and Brogdon, with the remainder going to Connie Brogdon and another individual.

89.     Brogdon also misappropriated the working capital from that offering.  He funneled the $300,000 designated for working capital through a Fidelity Bank account in the name of Knollwood NH, LLC, a Brogdon Entity, immediately back to the bank accounts for Saint Simons and BFLLC ($15,000 of which was transferred to Connie Brogdon's personal bank account).

90.     The Mobile III Bond Offering was a way for Brogdon, directly or indirectly, to retire his own debts and line his pockets with investor money without disclosing his role to investors.

**Brogdon Failed to Make Required Continuing Disclosures and Misrepresented His Compliance with Prior Undertakings**

91.     Because Brogdon and the Brogdon Entities failed to file required financial statements and material event notices for prior Brogdon Bond Offerings, Brogdon, directly or indirectly, misrepresented that he had complied with these undertakings in subsequent offerings.

92.     Brogdon failed to disclose the depletion and non-replenishment of the DSRFs for the Brogdon Bond Offerings, which is required by the Continuing Disclosure Agreements between the borrower and trustee for each offering.

93.     Brogdon failed to file material event notices on EMMA and its predecessor disclosing the sales of at least three properties that served as the security for the Brogdon Bond Offerings at tax sales.

94.     Brogdon also failed to file annual financial statements on EMMA and its predecessor for at least thirteen of the outstanding Brogdon Bond Offerings, despite his representations that he would do so.

95.     Despite these failures to make EMMA filings as required by the Continuing Disclosure Agreements, Brogdon misrepresented in subsequent offerings that the borrower entity

he controlled "ha[d] not failed to comply with any prior Undertakings under the Rule," with "Undertakings" defined to include the filing of notices of certain material events listed in Exchange Act Rule 15c2-12 [17 C.F.R. § 240.15c2-12] and annual financial statements.

96.     For example, in December 2008, the Facility serving as security for the City of Sumner, Illinois Healthcare Facility Revenue Bonds was sold at a tax sale.  As reflected on EMMA, Brogdon did not file a material event notice concerning the sale on EMMA.  Instead, Brogdon falsely stated in 30 subsequent bond and private placement offerings, through which he raised over $100 million, that the borrowers he controlled had complied with all prior continuing disclosure undertakings.

**Brogdon's Recent Misconduct**

97.     Brogdon's misconduct has continued through at least October 8, 2015, the date of Brogdon's first appearance for investigative testimony before Commission staff.

98.     As recently as September 2015, Brogdon used commingled funds from unrelated Facilities to satisfy debt service obligations on at least three outstanding Brogdon Bond Offerings: the Riverchase Bond Offering, the Mobile I Bond Offering and the Mobile II Bond Offering.  Since July 2015, Brogdon has made payments of over $190,000 from commingled funds on these three bond offerings alone.

99.     As recently as November 2015, Brogdon used a personal line of credit to make debt service payment on the Mobile I and Mobile II Bond Offerings, which was not a disclosed source of payment in the Official Statements for those bond offerings.

100.     The Official Statements for these offerings require that payments of principal and interest come from the revenues generated by the Facility and not from strangers or sources unrelated to the Facility.

24

101.    These recent debt service payments continue to run afoul of the source of payments disclosures to investors.

## FIRST CLAIM FOR RELIEF

### Violations of Section 17(a) of the Securities Act

102.    Paragraphs 1 to 101 are re-alleged and incorporated by reference as if fully set forth herein.

103.    By engaging in the acts and conduct alleged above, Brogdon directly or indirectly, in the offer or sale of securities by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails: (a) with scienter employed, and is employing, devices, schemes, or artifices to defraud; (b) obtained, and is obtaining, money or property by means of untrue statements of material fact or by omitting to state a material fact necessary in order to make statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged, and is engaging, in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchasers.

104.    By reason of the foregoing, Brogdon has violated and, unless restrained and enjoined, will continue to violate Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## SECOND CLAIM FOR RELIEF

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder

105.    Paragraphs 1 to 104 are re-alleged and incorporated by reference as if fully set forth herein.

106.    By engaging in the acts and conduct alleged above, Brogdon, directly or indirectly, in connection with the purchase or sale of securities, by the use of means or instrumentalities of interstate commerce, or of the mails, or of a Facility of a national security

exchange, with scienter: (a) employed, and is employing, devices, schemes, or artifices to defraud; (b) made, and is making, untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged, and is engaging, in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons, including purchasers and sellers of securities.

107.    By reason of the foregoing, Brogdon has violated and, unless restrained and enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C.§ 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder.

### THIRD CLAIM FOR RELIEF

**Violations of Sections 20(e) of the Exchange Act and Section 15(b) of the Securities Act**

108.    Paragraphs 1 to 107 are re-alleged and incorporated by reference as if fully set forth herein.

109.    By engaging in the conduct above, Brogdon, directly or indirectly, aided and abetted the primary violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5] and Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)] of the Brogdon Entities because he knowingly or recklessly provided substantial assistance to each of those persons' violations.

110.    By reason of the foregoing, Brogdon is liable under Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)] and Section 15(b) of the Securities Act [15 U.S.C. § 77o(b)].

## FOURTH CLAIM FOR RELIEF

### Violations of Section 20(a) of the Exchange Act

111.    Paragraphs 1 to 110 are re-alleged and incorporated by reference as if fully set forth herein.

112.    As alleged above, the Brogdon Entities violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

113.    At all times relevant, Brogdon was a control person of the Brogdon Entities for the purposes of Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)].

114.    At all relevant times, Brogdon exercised power and control over the Brogdon Entities, including by directing and causing the direction of the management and policies of those persons, and by directing and participating in the acts constituting the violation.

115.    By reason of the foregoing, Brogdon is liable as a control person under Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)], for the Brogdon Entities' violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## PRAYER FOR RELIEF

**WHEREFORE**, the Commission respectfully requests that this Court grant the following relief:

### I.

A Final Judgment finding that the Defendant violated the securities laws and rules promulgated thereunder as alleged herein.

### II.

An Order temporarily and preliminarily through a final judgment, and a Final Judgment, restraining and enjoining Defendant, his agents, servants, employees, and attorneys and all other persons in active concert or participation with him who receive actual notice of the injunction by

personal services or otherwise, and each of them, from directly or indirectly committing, or aiding and abetting or controlling, future violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 [17 C.F.R. § 240.10b-5].

## III.

A Final Judgment directing Defendant and Relief Defendants to disgorge all ill-gotten gains or unjust enrichment, plus prejudgment interest.

## IV.

A Final Judgment directing Defendant to pay a civil penalty pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 78t(d)]  and 21(d) of the Exchange Act [15 U.S.C. § 78u(d)].

## V.

A Final Judgment permanently prohibiting Defendant from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] or that is required to file reports pursuant to Section 15(d) of such the Exchange Act [15 U.S.C. § 78o(d)], pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)].

## VI.

An Order temporarily, and preliminarily through a final judgment, appointing a receiver over (a) the Brogdon Entities, with the exception of NAB; (b) any other nursing home, assisted living or retirement community Facilities or projects owned and/or controlled, directly or indirectly, by Brogdon; and (c) BFLLC, excluding its interest in any restaurants.

## VII.

An Order temporarily, and preliminarily through a final judgment, freezing the assets of Brogdon and Connie Brogdon, including their bank and brokerage accounts pending a final judgment, pursuant to the Court's equitable power and Section 21(d)(5) of the Exchange Act [15 U.S.C. § 78u(d)(5)].

**VIII.**

An Order temporarily, and preliminarily through a final judgment, enjoining the filing of any new bankruptcy, foreclosure, receivership, or other actions by or against any of the Brogdon Entities (with the exception of NAB) and BFLLC.

**IX.**

An Order requiring Defendant to submit a verified accounting.

**X.**

An order permitting expedited discovery.

**XI.**

An Order temporarily, and preliminarily through a final judgment, restraining and enjoining the Defendant and Relief Defendants and any person or entity acting at their direction or on their behalf, from destroying, altering, concealing, or otherwise interfering with the access of the Commission to relevant documents, books and records.

**XII.**

Granting such other and further relief as this Court deems just, equitable, or necessary in connection with the enforcement of the federal securities laws and for the protection of investors.

## JURY DEMAND

Pursuant to Rule 39 of the Federal Rules of Civil Procedure, Plaintiff demands that this case be tried to a jury.

Dated:  November 20, 2015
        New York, New York

Respectfully submitted,

By: /s/ *Sanjay Wadhwa*
    Sanjay Wadhwa
    Lara S. Mehraban
    Alexander M. Vasilescu
    Neal Jacobson
    Ranah L. Esmaili
    Lee A. Greenwood
    Attorneys for the Plaintiff
    SECURITIES AND EXCHANGE
      COMMISSION
    New York Regional Office
    Brookfield Place
    200 Vesey Street, Suite 400
    New York, NY 10281-1022
    (212) 336-0178 (Vasilescu)

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,**<br><br>   **Plaintiff,**<br><br> **v.**<br><br>**CHRISTOPHER FREEMAN BROGDON,**<br><br>   **Defendant,**<br><br> **-and-**<br><br>**CONNIE BROGDON, *et al.*,**<br><br>   **Relief Defendants.** | **Civil Case No.**<br><br><br>**Local Rule 11.2**<br>**Certification** |

Pursuant to Local Rule 11.2, I certify that the matter in controversy alleged in the foregoing Complaint is not the subject of any other action pending in any court, or of any pending arbitration or administrative proceeding.

Dated:  November 20, 2015
   New York, New York

           Respectfully submitted,

           */s/ Sanjay Wadhwa*_____
           Sanjay Wadhwa
           Senior Associate Regional Director
           Counsel for Plaintiff
           U.S. Securities and Exchange Commission
           New York Regional Office
           Brookfield Place
           200 Vesey Street, Suite 400
           New York, New York 10281-1022
           (212) 336-0181

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | **Civil Case No.** |
| **Plaintiff,** | |
| **v.** | **Designation of Agent for Service** |
| **CHRISTOPHER FREEMAN BROGDON,** | |
| **Defendant,** | |
| -and- | |
| **CONNIE BROGDON, _et al._,** | |
| **Relief Defendants.** | |

Pursuant to Local Rule 101.1(f), because the Securities and Exchange Commission (the "Commission") does not have an office in this district, the United States Attorney for the District of New Jersey is hereby designated as eligible as an alternative to the Commission to receive service of all notices or papers in the captioned action.  Therefore, service upon the United States or its authorized designee, Chief, Civil Division, Assistant United States Attorney, United States Attorney's Office for the District of New Jersey, Economic Crimes Unit, 970 Broad Street,

Newark, NJ 07102 shall constitute service upon the Commission for purposes of this action.


Dated:  November 20, 2015
        New York, New York

Respectfully submitted,

/s/ *Sanjay Wadhwa*_____
Sanjay Wadhwa
Senior Associate Regional Director
Counsel for Plaintiff
Securities and Exchange Commission
New York Regional Office
Brookfield Place
200 Vesey Street, Suite 400
New York, New York 10281-1022
(212) 336-0181